**Douglas A. MENNEN, Plaintiff,**

v.

**EASTER STORES, a Partnership, Stan Schlicher, and Dennis Easter, Defendants.**

**No. C 94–3011–MWB.**

United States District Court, N.D. Iowa, Central Division.

Jan. 9, 1997.

---

842

Michael G. Byrne, Winston & Byrne, P.C., Mason City, IA, for plaintiff.

Mark W. Thomas, Grefe & Sidney, P.L.C., Des Moines, IA, for defendants.

MEMORANDUM OPINION ON
TRIAL ON THE MERITS

TABLE OF CONTENTS

I. PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 843

II. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 844

III. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 847
 A. Mennen's Federal Polygraph Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 848
 1. Historical background and discussion of the EPPA . . . . . . . . . . . . . . . . . . . . . 849
 a. Debate precipitating the enactment of the EPPA . . . . . . . . . . . . . . . . . . . 849
 b. The EPPA–General prohibition of polygraph testing . . . . . . . . . . . . . . . . 850
 c. Exemptions from the EPPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 851
 2. Section 2002(1)—Requiring the polygraph examination . . . . . . . . . . . . . . . . . 852
 3. Section 2002(2)—Using the polygraph examination results . . . . . . . . . . . . . . 854
 4. Section 2002(3)—Discipline or discharge on the basis of test results . . . . . 855
 a. Discharge from his position as grocery manager . . . . . . . . . . . . . . . . . . . 855
 b. Constructive discharge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 857

B. Mennen's Damages Under The EPPA ................................. 858
 1. Payment of lost wages and benefits ................................ 859
 2. Damages for emotional distress ..................................... 864
 3. Punitive damages ................................................... 866

IV. CONCLUSION ........................................................... 867

---

BENNETT, District Judge.

Competing interests of crime detection and personal privacy require the court to navigate the relatively uncharted waters of the Employee Polygraph Protection Act, 29 U.S.C. § 2001, et seq., in order to determine whether the defendant employer has violated the Act by using the plaintiff's polygraph examination results, demoting him on the basis of those results, and ultimately constructively discharging him. While working for the defendants' grocery store, the plaintiff took a polygraph examination after he was implicated in a theft within the store. Following receipt of those results, the defendants promptly removed the plaintiff from his position as grocery manager and stripped him of his cash-handling and supervisory responsibilities. The plaintiff filed claims pursuant to federal and state polygraph statutes, asserting that the defendants used the plaintiff's examination results and took adverse employment action against him on the basis of those results. The defendants contend that their conduct did not violate either federal or state law in that they were merely cooperating with the police investigation of the theft. In addition, the defendants assert that the plaintiff's performance on the polygraph examination was only one factor in their decision to remove him as grocery manager of the store. After a three-day bench trial, the court must determine whether the defendants violated the polygraph statutes. If the court finds that the defendants are liable for violations of either or both statutes, then the court must further ascertain what remedies are available under the statutes and appropriate under the circumstances.

## I. PROCEDURAL BACKGROUND

On March 14, 1994, plaintiff Douglas A. Mennen filed a complaint in this court, alleging claims against defendants Easter Enterprises, Incorporated, Stan Schlicher, and Dennis Easter (collectively "Easter") under the Employee Polygraph Protection Act, 29 U.S.C. § 2001 et seq., the Iowa Polygraph Act, Iowa Code § 730.4, and state tort laws for loss of reputation and interference with employment opportunities. While working at the grocery store owned and operated by defendant Easter Enterprises, Incorporated, in Mason City, Iowa, Mennen took a polygraph examination after he was implicated in a theft from a cash register within the store. In his complaint, Mennen asserts that he was demoted from his position as grocery manager of the store based upon the polygraph examination results, which were released by the Mason City police department to defendant Stan Schlicher, the store manager. Specifically, Mennen contends that defendant Dennis Easter consulted with Schlicher regarding his polygraph examination and "based thereon either directed or participated in the decision to discipline [Mennen] as employee based upon the results of [the] polygraph examination." Amended Complaint ¶ 13. In addition, Mennen claims that the failure of Easter to reinstate him to his prior position as grocery manager and the stated intention of Easter to prohibit any future employment promotion or change of status following his demotion led to his constructive discharge. Mennen seeks damages against Easter for lost wages and benefits, future lost wages and benefits, loss of reputation, emotional damages, and such further relief as the court deems appropriate. On April 18, 1994, Easter answered Mennen's complaint, generally denying all of Mennen's allegations.

Mennen sought leave to amend his complaint on November 3, 1994, claiming that subsequent to the filing of his original complaint, Mennen learned that control of the store was exercised by Easter Stores, a Partnership, rather than defendant Easter Enterprises, Incorporated. The court granted Mennen's motion, and he amended his complaint on November 25, 1994, to add defen-

dant "Easter Stores, a Partnership" and to assert all claims previously made against defendant Easter Enterprises, Incorporated against the newly named defendant, Easter Stores, a Partnership.[1] On December 2, 1994, Easter answered Mennen's amended complaint, generally denying all of his allegations.

The parties tried this case to the court on April 15, 1996 in Fort Dodge, Iowa, and the parties presented their evidence on April 15, 16, and 18, 1996. Plaintiff was represented by Michael G. Byrne, Winston & Byrne, P.C., Mason City, Iowa. Easter was represented by Mark W. Thomas, Grefe & Sidney, P.L.C., Des Moines, Iowa. Closing arguments were heard telephonically on July 9, 1996,[2] and the case was submitted for the court's resolution of the issues raised therein.

## II. FINDINGS OF FACT

On February 20, 1992, during regular business hours, a thief or thieves victimized a Mason City grocery store owned and operated by Easter Stores, a Partnership, and absconded with approximately two hundred sixty-one dollars and one cent ($261.01) in cash, plus eighteen dollars and forty cents ($18.40) in coupons. Although there had been other thefts in various areas of the store, the February 20 theft was the only one in which a localized register was isolated as the source and in which a claim of recent controlled access could be established.

The manager of the Mason City store was defendant Stan Schlicher, and the assistant manager was Doug Phinney. Both Schlicher and Phinney opined that the person who committed the theft in question was a store employee and had compiled a list of employees who had access to the places where cash was missing throughout the store. Based upon this list, plaintiff Douglas Mennen was one of the store employees suspected of committing the theft on February 20, 1992.

Mennen had been a store employee from May 25, 1979 to April 25, 1992, and on February 20, 1992, he held the position of "grocery manager" in the store.[3] As the grocery manager, Mennen was responsible for handling money throughout the store, including preparing bank deposits, overseeing cashiers and the courtesy counter, obtaining change for the cashiers, and authorizing check cashing to customers. Occasionally, Mennen would also operate a cash register and assist in checking out customers when the store was busy or when another cashier was either at break or on his or her lunch hour.

Prior to February 20, 1992, Schlicher and Phinney had discussed their concerns that Mennen might be involved in the thefts occurring throughout the store, and Schlicher also communicated his concerns to defendant Dennis Easter, the chief executive officer of Easter Stores, a Partnership. The February 20, 1992 theft occurred on cash register number four, a register assigned to cashier Karen Rosenberger. Normally, cash register number three was assigned to "the boys" who worked for the store, including stockers and department managers.

After Karen Rosenberger went to lunch on February 20, 1992, Mennen was called to the front of the store at approximately a few minutes after 1:00 p.m. to check out customers. Instead of going to "the boys' register," cash register number three, to check out customers, Mennen went to Rosenberger's register, cash register number four. Mennen testified that the cash drawer in register number four appeared normal to him as he checked several people through the line.[4]

---

1. Defendant Easter Stores, a Partnership, was alleged to be an Iowa corporation and the owner and operator of County Market in Mason City, Iowa, during all times relevant to the litigation.

2. Closing arguments were deferred until July 9, 1996, for the purpose of enabling the parties to file briefs addressing the issues raised at trial in further detail. The court established a briefing schedule, and before the hearing on closing arguments, the parties each filed initial briefs and reply briefs for the court's consideration.

3. Mennen began working at the Mason City store as a part-time stocker when he was in high school. Over the years he worked there, he was promoted to shift manager, then department manager, and ultimately grocery manager.

4. Mennen testified that he believed the money was taken from Rosenberger's register sometime between 1:00 p.m. and 1:45 p.m.

He then closed that aisle and went back to work in another area of the store.

Mennen was asked to check out customers again shortly before 2:00 p.m. He again went to Rosenberger's register, cash register number four. Upon opening the register drawer a second time, Mennen testified that there appeared to be money missing from Rosenberger's cash drawer. Rather than calling the problem to the attention of Phinney, Mennen checked with Rosenberger when she returned from lunch because he was unsure whether there was an actual shortage of cash in the drawer. Rosenberger confirmed that there was indeed cash missing from her drawer, and she immediately informed Phinney of the missing money. Upon counting the money in Rosenberger's cash drawer, the store bookkeeper determined that there was money missing from the cash drawer. Only Mennen and Rosenberger had used cash register number four, the register from which the money was missing, during the shift in which it was taken.

At approximately 2:20 p.m. on that same day, the store contacted the Mason City Police Department. A patrolman arrived at the store, followed shortly thereafter by Detective Donald Allen, an investigator with the police department. Detective Allen talked to the witnesses at the scene of the theft, including cashier Candace Nicholson, who informed him that she saw three suspicious persons in the store around the same time the theft likely occurred. However, Detective Allen suspected that the theft was an "inside job" and that an employee was responsible. Detective Allen also informed Schlicher that the police department would need the store's agreement to take polygraph

examinations of Mennen and Rosenberger before any action was taken.[5] Schlicher gave consent on behalf of the store to the police department for the administration of polygraph examinations to both Mennen and Rosenberger. If Schlicher had not consented to the polygraph examinations on behalf of the store, the police department would not have administered them.

Detective Allen then asked Mennen and Rosenberger to take polygraph examinations. Although Mennen was advised by the polygrapher that he did not have to comply with Detective Allen's request, he consented to take the polygraph test.[6] Mennen believed that taking the polygraph test was the only way to clear his name. While Detective Allen asked Mennen to take the polygraph test, Schlicher conveyed all other information involving the polygraph test to Mennen, including the date and time of the test.[7] Detective Allen indicated that after February 20, 1992, the day he requested that Mennen and Rosenberger take polygraph examinations, the police conducted no further investigation regarding the theft.

On March 24, 1992, Mennen took the polygraph examination, which was conducted by the Iowa Department of Criminal Investigation at the Mason City police station. Both Schlicher and Dennis Easter decided to wait for the results of the police investigation before taking any action against Mennen.[8] The results of Mennen's polygraph indicated that he showed some emotional distress or deception of some sort and that he did not pass the exam. On the other hand, Rosenberger's polygraph results demonstrated that

5. Detective Allen testified that the procedure involving a request for a polygraph examination is as follows: The police department first contacts the victim of the theft and talks with management staff because it needs the agreement of the victim to conduct a polygraph. If the victim agrees and if the investigating detective believes that a polygraph examination is appropriate, the detective contacts the employees in question and informs them that a polygraph test is voluntary. The detective then requests that they take the polygraph test.

6. Rosenberger also consented to take a polygraph test.

7. Rosenberger testified that Schlicher made all the arrangements for her polygraph test as well.

8. Schlicher and Dennis Easter had only two conversations about the February 20, 1992 incident and Mennen's alleged involvement. The first discussion took place on the morning after the theft, when Schlicher initially informed Dennis Easter about the theft. In the second conversation, Schlicher and Dennis Easter discussed the results of Mennen's polygraph examination and the employment action to be taken against Mennen.

she told the truth to the best of her knowledge and belief.

Detective Allen informed Schlicher of both Mennen's and Rosenberger's polygraph results on or about March 24, 1992 and March 27, 1992, respectively. Detective Allen also told Schlicher that he believed that Mennen was guilty; however, he did not believe he could prove the theft beyond a reasonable doubt and elected not to proceed with criminal charges against Mennen. Upon learning that the investigation would be closed without the imposition of criminal charges, Schlicher contacted Dennis Easter to decide the plan of action regarding Mennen's employment status.

Dennis Easter and Schlicher discussed their concerns about Mennen on April 3, 1996 and elected to change Mennen's job responsibilities by removing him from his cash handling duties in the store. However, up until April 6, 1992, Mennen had still been performing his cash handling duties as grocery manager of the store. On April 6, 1992, Mennen was removed as grocery manager of the store.[9] Although Mennen was forbidden to handle cash in the store and removed from his managerial position, neither his hours nor his wages were cut.[10] Schlicher advised Mennen that his removal from the grocery managerial position was permanent. Thus, as of April 6, 1992, Mennen became a "stocker," the job he performed initially in 1979 when he began working for the store part-time in high school.

Although he testified that he was not threatened with termination, Mennen was concerned about a potential job termination, particularly after he was told by Schlicher on the day he was demoted that he should start looking for other employment. Specifically, Schlicher told Mennen that as long as the Easters owned and operated the stores, they would not forget the circumstances involving the theft and questioned his honesty and integrity. Schlicher further commented that

if Mennen had the opportunity, it "might be in his best interests to take another opportunity, another position in another store."

Distraught over the alteration of his job status and feeling that his future with the store was gone and that he would never be promoted or transferred to another store, Mennen gave Easter two-weeks' notice of his intent to resign his position on April 10, 1992. Mennen's last day of employment at the store was April 25, 1992. As of that same date, Mennen's rate of pay was seven dollars and sixty cents ($7.60) per hour. At the time of his resignation, Mennen was working forty-eight hours per week.

Following Mennen's resignation, defendant Easter Stores, a Partnership sold all of its grocery stores. This sale was finalized before Mennen brought his lawsuit against Easter. After June of 1993, Easter was no longer in the grocery business. The Mason City store was sold to Nash Finch & Co. Easter had no agreement with Nash Finch as to whether the Easter store employees would retain their jobs as part of the sales transaction.

Most of the Easter store employees were hired by Nash Finch, but within approximately eighteen months, a considerable number of those employees had terminated their employment. In addition, when Nash Finch bought the Mason City store, former Easter employees who were hired by Nash Finch had their wages cut, and medical benefits offered to former Easter employees were different than those offered by Easter Stores. Nash Finch closed the Mason City store on December 13, 1995, and no store was opened to replace it. The building where the store once was remains vacant, and the Mason City employees of Nash Finch were forced to find other jobs.

In August of 1992, Mennen obtained a part-time job at Sears, a position which became full-time in May of 1993.[11] Sears offers Mennen medical insurance, a retirement

---

9. The store took no adverse employment action against Rosenberger, who passed the polygraph examination.

10. Mennen's work schedule, however, was changed after Easter removed him from his managerial position.

11. While working part-time at Sears from August of 1992 through May of 1993, Mennen also worked part-time for Blazek Electric, Inc.

plan, and paid holidays. Having made these factual findings, the court proceeds to the disposition of Mennen's claims.

## III. LEGAL ANALYSIS

### (including some further findings of fact)

 Mennen asserts claims against defendants Easter Stores, a Partnership,[12] Stan Schlicher, and Dennis Easter under the Employee Polygraph Protection Act ("EPPA"), 29 U.S.C. § 2001 et seq., the Iowa Polygraph Act, Iowa Code § 730.4, and state tort laws for loss of reputation and interference with employment opportunities.[13] Mennen maintains that he was demoted based upon the polygraph examination results released to Schlicher. Specifically, he contends

12. Mennen asserts the partnership is liable for the wrongful acts of its partners pursuant to Iowa Code § 486.13, which provides that

[w]here, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of the co-partners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefore to the same extent as the partner so acting or omitting to act.

Iowa Code Ann. § 486.13 (West Supp.1996).

13. At the conclusion of the trial, in an effort to assist the parties, the court listed the following legal issues which might be appropriate for briefing: (1) whether Mennen established a violation of his state law claim pursuant to Iowa Code section 730.4(2); (2) whether Mennen established a violation of 29 U.S.C. § 2002(1), (2), or (3)(b); (3) what is the appropriate causation standard for violations of any of the above subsections of 29 U.S.C. § 2002; (4) whether any of the exemptions authorized under the EPPA of 1988 apply in this case; (5) whether Mennen was constructively discharged; (6) whether Easter established that it would have reached the same employment decision regardless of the polygraph test, and what effect, if any, this would have on alleged violations of 29 U.S.C. § 2002(1), (2), or (3)(b), or Mennen's state law claim pursuant to Iowa Code 730.4(2); (7) what are the appropriate damages that the court may award pursuant to 29 U.S.C. § 2005(c)(1), and whether the phrase, "... such legal or equitable relief as may be appropriate ...," includes compensatory damages, damages for emotional distress, and punitive damages; (8) whether Mennen contributed in part to any emotional distress by disseminating information about his taking of the polygraph examination or the results of the examination to non-management co-employees or others; and (9) what is the appropriate cut-off date, if any, for Mennen's back pay or front pay

that Dennis Easter consulted with Schlicher regarding his polygraph examination and "based thereon either directed or participated in the decision to discipline [Mennen] as employee based upon the results of [the] polygraph examination." Amended Complaint ¶ 13. Easter argues that it merely cooperated with police authorities, who requested that Mennen take a polygraph examination and who conducted the examination. In addition, Easter asserts that it did not base its decision to remove Mennen from his position as grocery manager solely on the results of his polygraph examination; it contends that, irrespective of his performance on the polygraph examination, it had already lost confidence in his work and planned to alter his employment status with the store.[14]

claims. Having reviewed the parties' briefs and the trial transcript, the court will commence its analysis with the issue of whether Mennen has established a violation of the Employee Polygraph Protection Act, 29 U.S.C. §§ 2001–2009. After making that determination, the court will proceed to an analysis of Mennen's state law claims, provided that such analysis is necessary.

14. Easter contends that this case is governed "exclusively" by the Iowa polygraph statute, Iowa Code § 730.4. As support for this assertion, Easter cites 29 U.S.C. § 2009, which provides as follows:

Except as provided in subsections (a), (b), and (c) of section 2006 of this title, this chapter shall not preempt any provision of any state or local law ... that prohibits lie detection tests or is more restrictive with respect to lie detector tests than any provision of this chapter.

29 U.S.C. § 2009. Cf. 29 C.F.R. § 801.5 (in order for state statute not to be preempted, it must be stricter in all aspects of usage, i.e. procedural safeguards, the use of test results, the rights and remedies provided examinees, and the rights, remedies, and responsibilities of examiners and employers). Easter claims that because subsections (a), (b), and (c) of section 2006 are not involved herein, the federal statute does not apply to this case.

The court declines to adopt Easter's unsupported "reverse preemption" argument. Easter seems to read section 2009 to preclude a claim made pursuant to the federal polygraph statute if a plaintiff also raises a state law claim pursuant to a state polygraph statute. Whether or not the state statute is more restrictive than the federal statute is irrelevant to whether Mennen can recover under the EPPA. The Supremacy Clause of the United States Constitution states that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ...

The court will address these arguments in its disposition of Mennen's claims pursuant to the Employee Polygraph Protection Act.

### A. Mennen's Federal Polygraph Claim

Mennen asserts that he has established Easter's violation of the EPPA, 29 U.S.C. § 2002. He argues that Easter violated sections (1), (2), and (3) of section 2002 of the EPPA, in that it caused him to take a lie detector test, it used the results of that lie detector test, and it demoted him on the basis of the results of that lie detector test. Under 29 U.S.C. § 2002,

> [e]xcept as provided in sections 2006 and 2007 of this title, it shall be unlawful for any employer engaged in or affecting commerce or in the production of goods for commerce—
>
> (1) directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test;
>
> (2) to use, accept, refer to, or inquire concerning the results of any lie detector test of any employee or prospective employee;
>
> (3) to discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to take any such action against—

> (A) any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test, or
>
> (B) any employee or prospective employee on the basis of the results of any lie detector test....

29 U.S.C. §§ 2002(1), (2), and (3). Although Congress passed the EPPA eight years ago, a court applying the Act still finds itself in relatively uncharted territory, as case law applying the EPPA is sparse. Such case law as the court has found is of little help, because there are but few federal cases even mentioning the EPPA, and only a handful of these actually address claims made pursuant to the Act. Most of the cases addressing claims analyze whether the defendant in question is actually an "employer" under the EPPA for purposes of liability, rather than application of 29 U.S.C. § 2002, the standard for causation, or any other aspect of the Act that would even remotely aid this court in the disposition of Mennen's claim. Thus, for guidance on the context in which the EPPA was born and such clues on application of the Act as that context may provide, the court turns to the legislative history of the EPPA, as well as to legal commentary on its genesis and effect on the workplace.[15]

---

shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. This clause of the Constitution has given birth to the familiar, though not uncomplicated, doctrine of "statutory" preemption. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, ——, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995) (Supremacy Clause gives rise to doctrine of federal preemption). Thus, under the Supremacy Clause, when acting within constitutional limits, Congress is empowered to preempt state law. *See Hillsborough County, Florida v. Automated Medical Labs., Inc.,* 471 U.S. 707, 712–13, 105 S.Ct. 2371, 2374–75, 85 L.Ed.2d 714 (1985); *see also Garrelts v. Smithkline Beecham Corp.,* 943 F.Supp. 1023, 1032 (N.D.Iowa 1996) (citing *Hillsborough County,* 471 U.S. at 712–13, 105 S.Ct. at 2374–75).

While it is clear that Congress could have preempted state polygraph statutes with its enactment of EPPA, it expressly declined to preempt state polygraph statutes which are more restrictive than the federal law. However, the fact that Congress expressly declared its intention not to preempt more restrictive statutes is

not to be construed as a declaration that plaintiffs are left with but one claim, a claim pursuant to that state statute. Congress gave no indication in section 2009 or elsewhere in the EPPA that it intended to prohibit plaintiffs from pursuing both federal and state law claims pursuant to the respective polygraph statutes. On the contrary, section 2009 merely protects state statutory remedies which are more protective of the employee than the EPPA. *See Saari v. Smith Barney, Harris Upham & Co., Inc.,* 968 F.2d 877, 883 (9th Cir.1992). There is nothing in the language of the EPPA to indicate that state law governs Mennen's claim to the exclusion of the EPPA; thus, the court will analyze whether Mennen has established a violation of the EPPA before reaching his state law claims.

**15.** One legal commentator notes that "[t]he Act clearly explains when an employer may or may not require an employee to submit to a polygraph examination," and he cites this "clear explanation" as a possible justification for "the dearth of case law under the EPPA...." Michael F. Rosenblum, *The Expanding Scope of Workplace Security and Employee Privacy Issues,* 3 DEPAUL BUS.L.J. 77, 86 (1990–91) (citing *Little Court, DOL Activity Under Polygraph Protection Law,*

### 1. Historical background and discussion of the EPPA

#### a. Debate precipitating the enactment of the EPPA

Since its invention in the late 1920s, the polygraph has been the subject of debate by parties with widely disparate interests.[16] Peter C. Johnson, *Banning the Truth–Finder in Employment: The Employee Polygraph Protection Act of 1988*, 54 MO.L.REV. 155, 155 (1989) ("Johnson"). As the use of this machine increased in various legal and business sectors, the debate intensified, not only over the accuracy of the results of polygraph examinations, but over the use and abuse of these tests in the private employment sector. Johnson, 54 MO.L.REV. at 155; Michael F. Rosenblum, *The Expanding Scope of Workplace Security and Employee Privacy Issues*, 3 DEPAUL BUS.L.J. 77, 83 (1990–91) ("Rosenblum"). Initially developed as an adjunct to criminal investigations within the law enforcement community, polygraphs rapidly became part of routine testing and screening in the workplace, and employers, particularly those confronted with losses from employee theft, quickly adopted lie detectors as an expedient and inexpensive solution. S.REP. No. 100–284, p. 41; *see also* Note, Ching Wah Chin, *Protecting Employees and Ne-*

glecting Technology Assessment: The Employee Polygraph Protection Act of 1988, 55 BROOK.L.REV. 1315, 1315–16 (1990) ("Chin"). Thus, the explosive growth in polygraph tests, coupled with the rampant, unregulated use of these tests in the private employment sector, prompted Congress to address the need for federal regulation of polygraph testing in the workplace.[17] S.REP. No. 100–284, p. 41; *see also* Chin, 55 BROOK.L.REV. at 1315–16 (test results were often used as a pretext for discrimination or retaliation in the workplace).

In the ongoing or apparently ceaseless conflict between the employee's right to privacy and the employer's right to protect its business, Congress, as opposed to the state legislatures and courts, became the principal battleground for the fierce debate regarding the use of polygraph testing in the workplace.[18] *See generally* S.REP. No. 100–284, p. 47; *see also* Johnson, 54 MO.L.REV. at 163; Editorial Note, Andrew J. Natale, *The Employee Polygraph Protection Act of 1988—Should the Federal Government Regulate the Use of Polygraphs in the Private Sector?*, 58 U.CIN.L.REV. 559, 559 (1989) ("Employers and employees in the private sector are constantly at war regarding the methods that an employer can justifiably use to monitor the

DAILY LAB.REP. (BNA) No. 83, at A–10 (Apr. 30, 1990)).

**16.** The polygraph is a machine that simultaneously measures a series of physiological responses to a series of relevant and irrelevant questions. The basic theory underlying the polygraph is that a subject's honesty, dishonesty, or guilty knowledge can be judged from those physical responses that are scientifically related to emotional upset. Editorial Note, Andrew J. Natale, *The Employee Polygraph Protection Act of 1988—Should the Federal Government Regulate the Use of Polygraphs in the Private Sector?*, 58 U.CIN.L.REV. 559, 560–61 (1989). The reason for attributing relevance to those responses is based upon the scientific understanding that guilt is a learned response that causes inner conflict and emotional upset. The tension associated with the inner conflict of choosing between willful dishonesty and truthfulness is presumed to be measurable by recording changes in inherent body functions. *Id.* at 561. The polygraph does not directly measure whether the subject is either lying or telling the truth. Rather it merely records the physiological changes that occur as the subject responds to a series of questions requiring simple "yes" or "no" answers. *Id.*

**17.** The Congressional Committee discovered that many employers and polygraph examiners abused and manipulated the testing process and "frequently use[d] inaccurate or unfounded results to justify employment decisions which otherwise would be suspect." S.REP. No. 100–284, p. 47. While noting that this abuse was not true of all employers or examiners, the Committee found that it was "sufficiently widespread to warrant congressional action." *Id.*

**18.** For a time, it appeared that the primary battleground for this debate would be the individual state legislatures and courts. Various states developed statutes and common-law rules that embodied their respective public policies concerning the issue of employee polygraphing. However, "the concerted activity of several members of Congress shifted the site of the battle by producing the first piece of federal legislation governing the use of polygraphs and other lie detection devices in the private employment context." Editorial Note, Andrew J. Natale, *The Employee Polygraph Protection Act of 1988—Should the Federal Government Regulate the Use of Polygraphs in the Private Sector?*, 58 U.CIN.L.REV. 559, 559 (1989).

selection of a trustworthy workforce and to investigate the wrongful activities of present employees...."). In discussing the potential parameters of federal regulation of polygraph use in the private employment sector,[19] Congress considered arguments from representative warriors from each side of the battlefield. Proponents of polygraph use in the workplace cited the polygraph as a valuable tool necessary to ensure an honest, dependable workforce. *See* Polygraphs in the Workplace: Hearings before the Comm. on Labor and Human Resources, 100th Cong., 1st Sess. 46 (1987) (testimony of William J. Scheve, Jr., Pres., American Polygraph Ass'n); Note, Brad V. Driscoll, *The Employee Polygraph Protection Act of 1988: A Balance of Interests,* 75 IOWA L.REV. 539, 539 (1990) ("Driscoll"). These advocates claim that the threat of the polygraph examination acts as a deterrent to employees, that it is no less accurate than the methods used in many subjective employment decisions, and that the test can also be an avenue for innocent employees seeking to exonerate themselves from wrongful accusations. S.REP. No. 100–284, p. 47; Driscoll, 75 IOWA L.REV. at 555. On the other hand, those who advocate the employee's right to privacy contend that the probing of someone's body for the purpose of

determining whether he or she is telling the truth is "inherently offensive to civil rights." Johnson, 54 MO.L.REV. at 155 (citing Hearings on the Use of Polygraphs and Similar Devices by Federal Agencies Before the Subcomm. on Foreign Operations and Government Information, of the House Comm. on Government Operations, 93rd Cong., 2d Sess. 784 (1974) (statement of Sen. Sam Ervin) (other citation omitted)); Driscoll, 75 IOWA L.REV. at 553 (observing that employees concerned with the preservation of personal liberties denounce the polygraph as violative of privacy rights). In addition, these crusaders for the right to privacy argue that inquiries pertaining to such issues as sexual preference, political affiliation, and racial attitude heighten physiological responses, irrespective of whether the questions are answered, leading to inaccurate, unfounded results. Driscoll, 75 IOWA L.REV. at 556. After weighing these competing interests and conducting various hearings on this issue, Congress ultimately passed the EPPA in 1988. *See* 29 U.S.C. § 2001 et seq.

### b. The EPPA—General prohibition of polygraph testing

As set forth by Congress, the EPPA severely restricts the uses most private em-

---

19. In examining the debate concerning the use of polygraph examinations in the workplace, the court observes that the passage of the EPPA was the culmination of a lengthy struggle to adopt federal legislation in this area. For example, from 1979 through 1985, Congress considered over forty bills relating to lie detector tests without enacting any of them. Chin, 55 BROOK.L.REV. at 1319 (citing Note, Lie Detectors in the Workplace: The Need for Civil Actions Against Employers, 101 HARV.L.REV. 806, 814 (1988)). Those bills, however, tended to be more prohibitive on the use of polygraph examinations than the ultimate version of the EPPA, restricting all lie detector use except in national security agencies. *Id.* (citing, e.g., S. 1815, 99th Cong., 2d Sess. (1987); H.R. 1424, 99th Cong., 1st Sess. (1985); H.R. 6575, 96th Cong., 2d Sess. (1980); H.R. 3255, 96th Cong., 1st Sess. (1979); S. 845, 96th Cong., 1st Sess. (1979); S. 1845, 95th Cong., 1st Sess. (1977)).

During the 99th Congress, the House passed the Polygraph Protection Act of 1985, banning the private use of lie detectors in all but five industries, which dealt with national security, the manufacture and distribution of drugs, and private security agencies. Chin, 55 BROOK.L.REV. at 1320 (citing H.R. 1524, 99th Cong., 1st Sess.

(1985)). The Senate likewise introduced S. 1815, but the congressional session ended before the Senate could vote; thus, the bill was not enacted. S.REP. No. 284, 100th Cong., 1st Sess. 41, 44, reprinted in 1988 U.S.CODE CONG. & ADMIN.NEWS 726, 732. In 1987, the House once again passed a private-use prohibition as H.R. 1212, which only exempted two industries, namely, private security services and drug manufacturers and distributors. Chin, 55 BROOK.L.REV. at 1320; H.R.CONF.REP. No. 659, 100th Cong., 2d Sess. 11, 12, reprinted in 1988 U.S.CODE CONG. & ADMIN.NEWS 749, 750. The Senate offered a more flexible bill in December of 1987, S. 1904, which distinguished its exemptions by use and method, as opposed to industry. Chin, 55 BROOK.L.REV. at 1320; S.REP. No. 284, 100th Cong., 1st Sess. 41, 45, reprinted in 1988 U.S.CODE CONG. & ADMIN.NEWS 726, 732. A joint conference report that accepted most of the Senate amendments was submitted in May of 1988. Chin, 55 BROOK. L.REV. at 1320; H.R.CONF.REP. No. 659, 100th Cong., 2d Sess. 7, reprinted in 1988 U.S.CODE CONG. & ADMIN.NEWS 749. Congress finally passed the Act, and it was signed into law on June 27, 1988. Charles P. Cullen, *The Specific Incident Exemption of the Employee Polygraph Protection Act: Deceptively Straightforward,* 65 NOTRE DAME L.REV. 262, 273 (1990).

ployers may make of any type of lie detector device. Rosenblum, 3 DePaul Bus.L.J. at 83; Driscoll, 75 Iowa L.Rev. at 539 (noting that the EPPA sets forth employee-testing guidelines and safeguards to alleviate employment actions that may result from incorrect test evaluations and conflicting state laws). In general, section 2002 of the EPPA prohibits an employer from requiring an employee or applicant to take a lie detector test and also forbids any adverse action against an employee or applicant who fails or refuses to take a polygraph test, or who files a complaint, testifies, or exercises any right granted under the EPPA. *See* 29 U.S.C. § 2002; *Saari v. Smith Barney, Harris Upham & Co., Inc.*, 968 F.2d 877, 880 (9th Cir.) (discussing section 2002 of the EPPA and its broad general prohibition on employer use of lie detector tests), *cert. denied*, 506 U.S. 986, 113 S.Ct. 494, 121 L.Ed.2d 432 (1992).

### c. Exemptions from the EPPA

■ Although section 2002 serves to virtually eradicate polygraph use in the private employment sector, Congress created a limited exemption for an ongoing investigation of an employee's theft. *See* 29 U.S.C. § 2006(d).[20] Apparently persuaded by the employer/polygraph proponents' argument that the threat of a polygraph examination would serve as a deterrent to employee theft in the workplace, Congress allowed a narrow exception to the statutory protection of the employee's right to privacy provided in section 2002. S.Rep. No. 100–284, p. 47. The

legislative history of the EPPA, however, clearly reflects the legislative intent that this exemption be narrowly construed and subject to careful restrictions and conditions. S.Rep. No. 100–284, p. 47–48; *see also* Charles P. Cullen, *The Specific Incident Exemption of the Employee Polygraph Protection Act: Deceptively Straightforward*, 65 Notre Dame L.Rev. 262, 273 (1990) (employer invoking the ongoing investigation exemption must follow strict guidelines); *James v. Professionals' Detective Agency, Inc.*, 876 F.Supp. 1013, 1015 (N.D.Ill.1995) (citing Charles P. Cullen, *The Specific Incident Exemption of the Employee Polygraph Protection Act: Deceptively Straightforward*, 65 Notre Dame L.Rev. 262, 276 (1990)) (the purpose of the restrictions on the exemption was to eliminate adverse employment action based solely on lie detector results, protect employees' privacy rights, and reduce the possibility of inaccurate test results). Thus, the employer seeking application of the "ongoing investigation" exemption and implementing a polygraph test must provide the tested employee with certain procedural safeguards. Rosenblum, 3 DePaul Bus.L.J. at 83–84; *see also Lyle v. Mercy Hosp. Anderson*, 876 F.Supp. 157, 161 (S.D.Ohio 1995) (the regulations clarify that the ongoing investigation exemption "sets forth what information, at a minimum, must be provided to an employee if the employer wishes to claim the exemption") (citing 29 C.F.R. § 801.12(g)(1)). The stringent requirements of the exemption are demonstrative of the limits the EPPA places on the

---

**20.** 29 U.S.C. § 2006(d), referred to herein as the "ongoing investigation exemption," provides as follows:

Subject to sections 2007 and 2009 of this title, this chapter shall not prohibit an employer from requesting an employee to submit to a polygraph test if—
(1) the test is administered in connection with an ongoing investigation involving economic loss or injury to the employer's business, such as theft, embezzlement, misappropriation, or an act of unlawful industrial espionage or sabotage;
(2) the employee had access to the property that is the subject of the investigation;
(3) the employer had a reasonable suspicion that the employee was involved in the incident or activity under investigation; and
(4) the employer executes a statement, provided to the examinee before the test, that—

(A) sets forth with particularity the specific incident or activity being investigated and the basis for testing particular employees,
(B) is signed by a person (other than a polygraph examiner) authorized to legally bind the employer,
(C) is retained by the employer for at least 3 years, and
(D) contains at a minimum—
(i) an identification of the specific economic loss or injury to the business of the employer,
(ii) a statement indicating that the employee had access to the property that is the subject of the investigation, and
(iii) a statement describing the basis of the employer's reasonable suspicion that the employee was involved in the incident or activity under investigation.
*29 U.S.C. § 2006(d).*

employer's ability to subject its employees to polygraph testing for the purpose of protecting purely economic interests.[21] *See* Rosenblum, 3 DePaul Bus.L.J. at 83–84; *see also Lyle*, 876 F.Supp. at 161 (if employer fails to provide the required information in order to qualify for the exemption, it cannot find safe haven from liability in the exemption).

■ In addition to the ongoing investigation exemption, Congress included other exemptions to the EPPA, including exemptions for federal, state, and local government employers; security services; firms authorized to manufacture, distribute, or dispense controlled substances; and the federal government when it is dealing with outside contractors engaged in national security intelligence or counter-intelligence.[22] *See* 29 U.S.C. § 2006; *see also Saari*, 968 F.2d at 880 (discussing exemptions to section 2002 of the EPPA); *Rubin v. Tourneau, Inc.*, 797 F.Supp. 247, 249 (S.D.N.Y.1992) (discussing exemptions to the EPPA). By including these exemptions to the EPPA, particularly the ongoing investigation exemption, Congress apparently sought to reconcile the divergent interests on each side of the polygraph issue. Johnson, 54 Mo.L.Rev. at 166. The balance, however, is clearly in the employees' favor, as the procedural hurdles and the narrow interpretation that must accompany the ongoing investigation exemption require the employer's strict compliance. In

other words, the EPPA's provisions clearly provide that an employer's failure to follow all of the listed procedures and guidelines will constitute a forfeiture of the ongoing investigation exemption and will result in liability under the EPPA. *See* 29 U.S.C. § 2007(b); Natale, 58 U.Cin.L.Rev. at 585.

Having discussed the background leading to the federal statutory protection of employees against polygraph testing in the private employment sector, the language of the EPPA itself, and the exemptions from the EPPA, the court turns to an application of the EPPA to Mennen's case. While case law is scarce regarding the application of section 2002, the language of the statute itself, the legislative history, and the federal regulations further explaining the statutory provisions of the EPPA collectively provide a guide to the court's analysis of this case and the issues therein.

### 2. Section 2002(1)—Requiring the polygraph examination

■ Mennen asserts that Easter required or caused Mennen to take the polygraph test in violation of section 2002(1) of the EPPA. Under section 2002(1), it shall be unlawful for an employer "directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector." 29 U.S.C. § 2002(1). Mennen contends that although Detective Al-

---

21. Further evidence of the legislative intent to protect the employee's right to privacy is the limitation Congress placed upon the ongoing investigation exemption, in addition to the guidelines and safeguards detailed in 29 U.S.C. § 2006(d). 29 U.S.C. § 2007(a)(1) provides that

[e]xcept as provided in paragraph (2), the exemption under subsection (d) of section 2006 of this title shall not apply if an employee is discharged, disciplined, denied employment or promotion, or otherwise discriminated against in any manner on the basis of the analysis of a polygraph test chart or the refusal to take a polygraph test, without additional supporting evidence. The evidence required by such subsection may serve as additional supporting evidence.

29 U.S.C. § 2007(a)(1). Thus, even if an employer can reasonably identify an employee who may be involved with a specific incident of economic loss and takes the appropriate procedural steps, the employer cannot discharge, discipline, deny employment, or otherwise discriminate against

an employee in any manner solely on the basis of the analysis of a polygraph test. *See* 29 U.S.C. §§ 2006(d), 2007(a)(1). The employer must have additional supporting evidence before taking such adverse employment action. *See* 29 U.S.C. § 2007(a)(1).

22. At least one legal commentator has observed that the distinction between the private and public employment sectors and the exemption provided in the public sector appears hypocritical. If, in fact, the polygraph is void of scientific reliability, its use in the public sector does not cure its fallibility. Thus, if the inaccuracy of the polygraph was a contributing factor in the decision to virtually ban polygraph testing in the private sector, why should the inaccuracy be any less troubling to continued polygraph testing in the public sector? *See* Yvonne Koontz Sening, *Heads or Tails: The Employee Polygraph Protection Act*, 39 Cath.U.L.Rev. 235, 268 (1989) (citing 133 Cong.Rec. H9,577 (daily ed. Nov. 4, 1987) (statement of Rep. Jacobs)).

len requested and suggested that Mennen take the polygraph test, the actions of Easter and the circumstances surrounding the request for the examination "caused" Mennen to take the polygraph test. Easter maintains, however, that it merely cooperated with the police department in its investigation of the theft at the store; it did not request, suggest, or cause Mennen to submit to the polygraph test. Furthermore, Easter contends that the EPPA was never intended to be applied in the manner proposed by Mennen and that the drafters of the federal polygraph statute recognized that polygraph examinations would be used for the investigation of a crime and did not prohibit such use.

The parties do not dispute that Detective Allen was the person who requested that Mennen take the polygraph examination and that the police department conducted the examination. Rather, the contested issue is whether Easter's involvement crossed the line between mere passive cooperation with law enforcement authorities investigating a crime and active participation in the testing of the employees in question.

The Department of Labor sheds some light on this virtually unlitigated statute and its applicability to this case, providing that "[e]mployers who cooperate with police authorities during the course of their investigations into criminal misconduct are not deemed engaged in prohibitive conduct provided that such cooperation is passive in nature." 29 C.F.R. § 801.4(b). As an example, the Department of Labor notes that

> it is not uncommon for police authorities to request employees suspected of theft or criminal activity to submit to a polygraph test during the employee's tour of duty since, as a general rule, suspect employees are often difficult to locate away from their place of employment. Allowing a test on the employer's premises, releasing an employee during working hours to take a test at police headquarters, and other similar types of cooperation at the request of the police authorities would not be construed as "requiring, requesting, suggesting, or causing, directly or indirectly, any employee * * * to take or submit to a lie detector test." Cooperation of this type must be

distinguished from actual participation in the testing of employees suspected of wrongdoing, either through the administration of the test by the employer at the request or direction of police authorities, or through employer reimbursement of tests administered by police authorities to employees.

29 C.F.R. § 801.4(b). However, the Department of Labor expressly notes that "[t]he receipt by an employer of information from a polygraph test administered by police authorities pursuant to an investigation is prohibited under section [2007(2)] of the [EPPA]." 29 C.F.R. § 801.5(c).

Here, Detective Allen requested that Mennen take the polygraph examination. Mennen consented to take the examination, claiming that he wanted to clear his name. The police department needed Easter's permission to request that Mennen take the polygraph; however, at that point in time, Easter had not taken an active role in the investigation, used the results from the polygraph examination, or taken any adverse employment action against Mennen. Although Easter had the power to veto the administration of the polygraph examination, it did not require, request, suggest, or cause Mennen to take or submit to a polygraph examination. *See* 29 U.S.C. § 2002(1). Rather, Mennen chose to take the polygraph examination at the request of the Mason City police department. While it may not be free from all doubt, the court finds that Easter had not yet crossed that line between merely cooperating with the Mason City police department and actively participating in the investigation. *See* 29 C.F.R. § 801.4(b). Therefore, the court concludes that Mennen has not established that Easter violated section 2002(1) of the EPPA.

Although the court finds that Easter's cooperation with the police department did not rise to the level of active participation in the request of a polygraph examination, the question remains as to whether Easter's conduct after the police department conducted the polygraph examination of Mennen violated the EPPA's additional prohibitions regarding polygraph testing in the private employment sector. Thus, the court turns to

the consideration of Mennen's claim that Easter violated section 2002(2) of the EPPA by using the results of Mennen's polygraph examination.

### 3. Section 2002(2)—Using the polygraph examination results

■ Mennen also contends that Easter used the results from his polygraph examination in violation of section 2002(2) of the EPPA. Section 2002(2) of the EPPA provides that it shall be unlawful for an employer "to use, accept, refer to, or inquire concerning the results of any lie detector test of any employee or prospective employee." 29 U.S.C. § 2002(2). Easter does not contend that it did not use the results of Mennen's polygraph; in fact, it acknowledged that Mennen's polygraph test results were the "final piece of the puzzle" leading to its decision to remove Mennen from his position as grocery manager. However, Easter argues that it is unfair to apply the EPPA to a situation where a private employer receives polygraph test results from a police investigation. It maintains that the EPPA clearly provided an exemption for ongoing investigations by an employer into employee theft and that if it had wanted to conduct its own polygraph test as part of its investigation of the theft, it could have done so under the EPPA, as it is a permissible use of polygraph results under the Act. Easter asserts that the purpose of the EPPA was not to preclude the employer from protecting its business from dishonest employees accused of specific incidents of theft, as alleged here; thus, it should not be liable for using Mennen's polygraph examination results as part of its employment decision to remove him from his position as grocery manager. Lastly, Easter claims that any communications between an employer and a governmental agency about a criminal investigation are allowed under the EPPA and that this statutory provision is further indication of the legislative intent to allow the use of polygraph results by a private employer investigating a specific incident of theft.

The court is aware that Congress, persuaded by the employer/polygraph proponents' argument that the polygraph was an essential tool in protecting a business from employee theft, included the ongoing investigation exemption in the EPPA to permit the use of polygraph results in circumstances involving the continuing investigation of a theft. However, as the court discussed above, employers seeking to invoke this exemption are subject to explicit, strict procedural guidelines and safeguards. *See* 29 U.S.C. § 2006(d). An employer who does not adhere to the exemption's express requirements forfeits the right to claim the exemption from liability under the EPPA. Thus, Easter is correct in that clearly, the EPPA contemplates the situation in which Easter found itself with Mennen and provides explicit instructions as to how Easter could have protected its business and acted in response to results of a polygraph test that implicated its employee in the store theft. Easter, however, had to comply with all of the requirements specified in sections 2006(d) and 2007(a)(1) in order to invoke use of the ongoing investigation exemption, and it failed to follow the proper channels necessary to receive the limited protection the EPPA provides. Now, after failing to follow the guidelines expressly articulated in the federal statute, Easter looks to the court to give it an escape from liability after the fact. Congress drafted a statute that strikes a delicate balance between the employee's right of privacy with the employer's need to protect its business and economic interests and gives the employer the opportunity to exempt itself from liability. Whether because of ignorance of the EPPA or because of its own volition, Easter failed to seize the opportunity provided under the EPPA. The court is not willing to circumvent the explicit requirements of the statute to provide Easter with the protection it could have had in the first place had it followed the law. Clearly and by its own admission, Easter used Mennen's results from the polygraph examination.[23] Thus, the court finds that Easter violated section 2002(2) of the EPPA.

---

**23.** Although Easter contends that the EPPA allows communications about an ongoing investigation between a governmental agency and an

employer, a more careful reading of section 2008 reveals that the EPPA allows the disclosure of information from the polygraph test by an em-

#### 4. Section 2002(3)—Discipline or discharge on the basis of test results
##### a. Discharge from his position as grocery manager

■ Mennen also asserts that Easter both disciplined and discharged him from his position as grocery manager of the store on the basis of his polygraph test results in violation of section 2002(3) of the EPPA. Under section 2002(3) of the EPPA, it shall be unlawful to discharge, discipline, discriminate against in any manner, or deny employment or promotion to, or threaten to take any such action against—

(A) any employee or prospective employee who refuses, declines, or fails to take or submit to any lie detector test, or

(B) any employee or prospective employee on the basis of the results of any lie detector test.

29 U.S.C. § 2002(3). Easter argues that in order to prove a violation of section 2002(3)(B), Mennen must establish that Easter disciplined or discharged him "on the basis of the results of [the] lie detector test." Furthermore, Easter claims that the purpose of the EPPA is to eliminate adverse employment actions based *solely* on lie detector results. Easter cites the limitation on the ongoing investigation exemption provided in section 2007(1), which prohibits an employer who invokes the ongoing investigation exemption from taking adverse employment action against an employee on the basis of polygraph test results, *without additional supporting evidence.* See 29 U.S.C. § 2007(a)(1) (emphasis added). Because Easter contends that it did not base its decision to remove Mennen from his position as grocery manager solely on the basis of his polygraph test results, it claims it is not liable under the EPPA. Rather, both Schlicher and Dennis Easter characterize the fact that Mennen did not pass the polygraph test as the "final piece of the puzzle" or a contributing factor in making their decision to alter his employment status with the store. Easter maintains that it discharged Mennen as grocery manager and removed him from

cash-handling responsibilities in the store because it had lost trust and confidence in him, not because of the polygraph test results alone. Lastly, Easter asserts that regardless of the polygraph test results, it had already lost trust and confidence in Mennen and would have made the decision to "reassign" him in any event.

Regarding the causation standard for section 2002(3), again, the case law provides no assistance in determining whether Easter is correct in assuming that even without invoking the ongoing investigation exemption, the standard for causation only requires that an employer's adverse employment action may not be based *solely* on polygraph results. Section 2002(3) clearly provides that it shall be unlawful for an employer to take adverse employment action against an employee "on the basis of the results of [the employee's] lie detector test." See 29 U.S.C. § 2002(3). The statutory provision is silent as to whether the employer's reliance on the polygraph test results must be the *sole* basis for the adverse employment action. However, in enacting the EPPA, it was the clear intent of Congress to protect an employee's right to privacy and to narrowly construe the exemption provided for employers seeking to protect their business from employee theft. S.REP. No. 100–284, p. 47. Thus, it seems contrary to those legislative goals to read into the statute a more stringent standard of causation. In other words, the court declines the opportunity to "assume" that an employer who has failed to invoke the ongoing investigation exemption can take adverse employment action against an employee, so long as the polygraph results are not the *sole* basis for its decision. The court will not undercut the express language of the statute, absent authority for such a broad interpretation.

■ However, even under the stringent standard for causation Easter proposes, the evidence clearly indicates that Mennen's polygraph test results provided the only ba-

ployer "only to a governmental agency, but only insofar as the disclosed information is an admission of criminal conduct." 29 U.S.C. § 2008(c)(2). The EPPA says nothing about the disclosure of information by the governmental

agency to the employer. Furthermore, the issue is not whether the information was disclosed; it is whether Easter used the results of Mennen's polygraph test in violation of the EPPA, which it clearly did.

sis for Easter's decision to remove Mennen from his position as grocery manager. Easter contends that its loss of trust and confidence in Mennen also contributed to its decision to remove Mennen from his position as grocery manager of the store. Schlicher and Phinney, however, both maintain that they had begun to lose trust and confidence in Mennen even before the theft in question, monitoring his behavior at an employee meeting and suspecting him in other alleged thefts occurring in other areas of the store, and yet Easter took no adverse employment action against Mennen. Schlicher and Dennis Easter further allege that they lost trust and confidence in Mennen on February 20, 1992, the day of the theft in question. If, in fact, Easter had lost trust and confidence in Mennen before it received his polygraph test results, it made no indication of it, in that Mennen was allowed to continue as the grocery manager and perform his cash-handling responsibilities, up until Easter received his polygraph test results. Rather, shortly after Schlicher learned of Mennen's polygraph test results, he and Dennis Easter made the decision to remove Mennen as grocery manager and prohibit him from performing tasks involving the handling of money. While Dennis Easter contends that he had doubts about Mennen's honesty before he knew the results of Mennen's polygraph examination, these doubts did not prompt him to take action. If Dennis Easter, Schlicher, or Easter Stores had doubts about Mennen's honesty, they still trusted Mennen enough to allow him to continue his cash-handling responsibilities, of which there were many. It was not until they learned that Mennen did not pass the polygraph examination that they decided to take adverse employment action; thus, the court finds that the results of Mennen's polygraph examination provided the basis for Easter's decision to remove Mennen as grocery manager of the store.

Although Dennis Easter maintains he would have reassigned Mennen regardless of the outcome of his polygraph test, the court is not persuaded by his after-the-fact declaration that he had lost faith in Mennen long before receiving the results of Mennen's polygraph test. Furthermore, Schlicher admitted that had Mennen passed the poly-

graph, he would not have been removed as grocery manager. The only reason Easter was motivated to make a decision or to take action against Mennen was the results of his polygraph examination. Easter waited for the results, and as soon as it received them, it removed Mennen from his position and stripped him of his responsibilities. The EPPA was designed to eliminate this type of reliance on polygraph testing in the private employment sector. Certainly, Easter had every right under the EPPA to invoke the ongoing investigation exemption; however, it failed to do so. The court cannot make its findings on what Easter could have done had it followed the guidelines in the statute; it can only adjudicate the facts that are before it.

The irony of this case is that Mennen may well have committed the theft from the cash register in the store on February 20, 1992. Perhaps even more ironic is that Easter could have discharged Mennen, prior to any polygraph examination, simply based upon a mere suspicion that he committed the theft, and the court would have deferred to Easter's decision. *See Slathar v. Sather Trucking Corp.*, 78 F.3d 415, 418 (8th Cir.) ("An employer has the right to make business decisions, so long as they are made in a nondiscriminatory manner.") (citing *Walker v. AT & T Technologies*, 995 F.2d 846, 849–50 (8th Cir.1993)), *cert. denied*, — U.S. —, 117 S.Ct. 179, 136 L.Ed.2d 118 (1996); *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir.1995) ("It has become a commonplace for this court to observe, and it observes again here, that the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.") (citations omitted). However, instead of exercising its business judgment to discharge Mennen when it suspected him of the theft, Easter did nothing until it received the polygraph results. Easter overlooked two opportunities to discharge or discipline Mennen legally: first, by failing to discharge him upon its initial suspicion after the theft

but before the request for the polygraph examination was made, and second, by failing to follow the guidelines set forth in the ongoing theft exemption under section 2006(d) of the EPPA. Instead of exercising its business judgment at either of these times, Easter asserts only after receiving Mennen's polygraph examination results that its removal of Mennen was an exercise of business judgment. While in one sense one can hardly fault Easter for waiting for the results of the polygraph examination—ostensibly wanting the assurances of a polygraph test rather than relying on mere suspicion, this is a choice Congress clearly foreclosed when it passed the EPPA. Thus, the court concludes that Mennen has shown that Easter disciplined or discharged him from his position as grocery manager of the store on the basis of his polygraph test results in violation of section 2002(3) of the EPPA.

### b. Constructive discharge

■ Mennen further contends that by discharging him as grocery manager and stripping him of his responsibilities, Easter forced him into an involuntary resignation. By demoting him to the position of stocker, the job he originally held when he began working for the store in 1979 while in high school, Mennen argues that this demotion or reassignment made his working conditions intolerable and led to his constructive discharge. Easter, on the other hand, asserts that Mennen quit his job at the store based upon a subjective belief that he would be fired in the future and that because he submitted his letter of resignation only a few days after he was reassigned, clearly it did not make Mennen's working conditions so intolerable that he was forced to resign.

■ A constructive discharge exists when an employer deliberately renders the employee's working conditions intolerable and thus forces the employee to quit. *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir.1996) (citing the *"Bunny Bread"* standards for this kind of claim found in *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir.1981)); *Parrish v. Immanuel Medical Ctr.*, 92 F.3d 727, 732 (8th Cir.1996) (citing the *Bunny Bread* standards); *Allen v.*

*Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir.1996) (citing the *Bunny Bread* standards); *Bradford v. Norfolk S. Corp.*, 54 F.3d 1412, 1420 (8th Cir.1995) (citing the *Bunny Bread* standards); *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir.1995) (citing the *Bunny Bread* standards); *Smith v. World Ins. Co.*, 38 F.3d 1456, 1460 (8th Cir.1994) (citing *Bunny Bread*); *Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101*, 3 F.3d 281, 284 (8th Cir.1993) (citing *Bunny Bread*); *Smith v. Cleburne County Hosp.*, 870 F.2d 1375, 1381 (8th Cir.), *cert. denied*, 493 U.S. 847, 110 S.Ct. 142, 107 L.Ed.2d 100 (1989); *Southside Pub. Sch. v. Hill*, 827 F.2d 270, 274 (8th Cir.1987). First, the conditions created by the employer must be such that a reasonable person would find them intolerable. *Tidwell*, 93 F.3d at 494; *Parrish*, 92 F.3d at 732; *Allen*, 81 F.3d at 796; *Bradford*, 54 F.3d at 1420; *Smith*, 38 F.3d at 1460; *Hukkanen*, 3 F.3d at 284; *Craft v. Metromedia, Inc.*, 766 F.2d 1205, 1217 (8th Cir.1985), *cert. denied*, 475 U.S. 1058, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *Bunny Bread*, 646 F.2d at 1256. Second, the employer's actions must have been taken with the intention of forcing the employee to quit. *Tidwell*, 93 F.3d at 494; *Parrish*, 92 F.3d at 732; *Allen*, 81 F.3d at 796; *Smith*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284; *Bunny Bread Co.*, 646 F.2d at 1256. If there is no evidence that the defendant took actions with an intent to force the plaintiff to quit, even if conditions were intolerable, plaintiff's claim fails. *Craft*, 766 F.2d at 1217.

■ The standards in *Bunny Bread* do not mean constructive discharge plaintiffs must prove their employers consciously meant to force them to quit. *Hukkanen*, 3 F.3d at 284. But, when an employer denies a conscious effort to force an employee to resign, the employer must necessarily be held to intend the reasonably foreseeable consequences of its actions. *Tidwell*, 93 F.3d at 494; *Parrish*, 92 F.3d at 732; *Allen*, 81 F.3d at 796; *Kriss v. Sprint Communications Co., Ltd. Partnership*, 58 F.3d 1276, 1283 (8th Cir.1995); *Smith*, 38 F.3d at 1461; *Hukkanen*, 3 F.3d at 284–85. Constructive discharge plaintiffs may therefore satisfy

*Bunny Bread's* intent requirement by showing their resignation was a reasonably foreseeable consequence of their employers' discriminatory actions. *Hukkanen,* 3 F.3d at 284–85. However, where an employer has attempted to accommodate an employee, the employer has been held not to have constructively discharged the employee. *Cleburne County Hosp.,* 870 F.2d at 1380–81. In addition, "to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." *West,* 54 F.3d at 498 ("[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged").

Here, Mennen was discharged from the managerial position which he had worked thirteen years to acquire. Furthermore, not only was he demoted, he was placed in the employment position he had held when he was first hired as a high school student, with the exception that he retained his salary and his hours. After being in a position of authority in the store, cashiers whom he formerly supervised were forbidden to give him the keys to the register or to allow him to be near the cash in the store. The theft and the results of the polygraph examination were both known throughout the store among personnel. In effect, Mennen's hopes of repeating his rise to managerial status in the store were gone. Schlicher himself told Mennen that if another employment opportunity came along, he should take it because Easter doubted Mennen's honesty and would never forget the "incident." While it may not be free from all doubt, the court finds that, by its adverse employment action, Easter created conditions that a reasonable person would find intolerable. *Tidwell,* 93 F.3d at 494.

Regarding the intent requirement of a constructive discharge claim, *see Bunny Bread,* 646 F.2d at 1256, it defies reason to believe that Schlicher and Dennis Easter could not reasonably foresee that Mennen would resign because of his reassignment and removal from the position of grocery manager. Schlicher essentially confirmed Mennen's

fears that his future with the store was gone and encouraged him to seek other opportunities. Furthermore, Schlicher alluded to the permanence of Easter's attitude and decision regarding Mennen when he told Mennen that Easter would never forget the "incident" because his honesty had been questioned. Thus, the court finds that Mennen has satisfied *Bunny Bread's* intent requirement by showing his resignation was a reasonably foreseeable consequence of the Easter's discriminatory actions. *Hukkanen,* 3 F.3d at 284–85. Because Mennen has satisfied the *Bunny Bread* requirements, the court finds in favor of him on his constructive discharge claim against Easter.

Having found that Mennen established that Easter violated sections 2002(2) and 2002(3) of the EPPA and that it constructively discharged Mennen from employment at the store, the court turns to Mennen's claims regarding the appropriate measure of damages to be awarded against Easter.[24]

### B. Mennen's Damages Under The EPPA

Mennen asserts that the appropriate damages that the court may award upon a finding of liability under the EPPA include damages for lost wages and benefits, emotional distress damages, and punitive damages. Section 2005(c)(1) of the EPPA provides as follows:

An employer who violates this chapter shall be liable to the employee or prospective employee affected by such violation. Such employer shall be liable for such legal or equitable relief as may be appropriate, including, but not limited to, employment, reinstatement, promotion, and the payment of lost wages and benefits.

29 U.S.C. § 2005(c)(1). Mennen claims that compensatory damages are the legal damages normally available by statute and for all federal civil rights and employment-regulated statutes. Thus, he should be able to recover compensatory damages, including past and future lost wages and benefits, direct out-of-pocket expenses, emotional distress damages, and punitive damages.

---

**24.** Because the court has found that Easter is liable under the EPPA and because the Iowa polygraph statute provides no greater relief than

the EPPA, the court need not reach Mennen's state law claim pursuant to Iowa Code 730.4(2).

Mennen further argues that the sale of the Mason City store to Nash Finch in June of 1993 should not cut off his claim for lost wages; rather, he asserts that the appropriate cut-off date for his claim is ten years after the date of his constructive discharge. Easter, on the other hand, asserts that the June 24, 1993 sale of Easter Stores' business cuts off Mennen's claim for lost wages and benefits. Easter contends that it no longer paid any employees' salaries after that date; therefore, it is illogical that Easter should be liable to Mennen for lost wages beyond that date. In the alternative, Easter argues that the closing date of the Mason City store should certainly cut off any claim for lost wages in that many grocery employees found themselves looking for employment elsewhere. Easter also claims that Mennen is not entitled to either emotional distress damages in that he contributed to any distress he suffered by disseminating information to other store employees about his taking of the polygraph examination and the results of the examination. Lastly, Easter asserts that Mennen cannot recover an award of punitive damages in that the statute does not provide for the recovery of such damages. Even if punitive damages are an appropriate remedy under the EPPA, Easter maintains that Mennen cannot show that Easter acted with malice or reckless indifference to his federally protected rights. Having briefly discussed the parties' arguments regarding the availability and propriety of damages, the court turns first to Mennen's claim for lost wages and benefits.

### 1. Payment of lost wages and benefits

Mennen asserts that he is entitled to lost wages and benefits for the time period dating from his constructive discharge on April 25, 1992, to ten years following that discharge, minus any other income he has subsequently earned at Sears or elsewhere. While the sparse caselaw discussing the EPPA does not address the application of 29 U.S.C. 2005(c)(1) or the imposition of damages in cases brought under the EPPA, a comparison can be drawn between a victim of discriminatory or adverse employment action in violation of the EPPA and a victim of discriminatory or adverse employment action in violation of Title VII of the Civil Rights Act of 1964, § 701 et seq., as amended, for purposes of analyzing the imposition of damages under the EPPA.

■■■■ In a case brought pursuant to Title VII of the Civil Rights Act of 1964, § 701 et seq., as amended, the district court has broad equitable discretion to fashion back-pay awards in order to make a Title VII victim whole.[25] *See Equal Employment Opportunity Comm'n v. Cherry–Burrell Corp.,* 35 F.3d 356, 360 (8th Cir.1994) (citing *Equal*

---

25. The district court has the same broad equitable discretion to calculate an award of front-pay. *See Hukkanen v. International Union of Operating Eng'rs, Hoisting & Portable Local No. 101,* 3 F.3d 281, 286 (8th Cir.1993) (citing *MacDissi v. Valmont Indus., Inc.,* 856 F.2d 1054, 1060 (8th Cir. 1988)) (in Title VII case, where the effect of the unlawful constructive discharge was plaintiff's acquisition of a lower paying job, district court's award of front-pay for a period of ten years was reasonable and necessary to afford plaintiff an opportunity to obtain employment having pay and responsibilities equal to the pay and responsibilities sustained at former workplace). Front-pay may be an appropriate remedy for returning a victim of discrimination to the position he or she would have occupied absent the discrimination. *See Carter v. Sedgwick County, Kan.,* 36 F.3d 952, 958 (10th Cir.1994) (in Title VII case, purpose of front-pay award is to make the victim of discrimination whole); *see also James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 358 (5th Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978) (Title VII case);

*Equal Employment Opportunity Comm'n v. Enterprise Ass'n Steamfitters Local No. 638 of U.A.,* 542 F.2d 579 (2d Cir.1976), *cert. denied,* 430 U.S. 911, 97 S.Ct. 1186, 51 L.Ed.2d 588 (1977) (same). *Cf. Padilla v. Metro–North Commuter R.R.,* 92 F.3d 117, 125 (2d Cir.1996) (in ADEA case, noting that front-pay makes victims whole in cases where the factfinder can reasonably predict that the plaintiff has no reasonable prospect of obtaining comparable alternative employment) (citing *Whittlesey v. Union Carbide Corp.,* 742 F.2d 724, 728 (2d Cir.1984)); *Barbour v. Merrill,* 48 F.3d 1270, 1279 (D.C.Cir.1995) (purpose of front-pay is to make victim of discrimination whole and to restore him or her to economic position he or she would have had but for the unlawful conduct of the employer), *cert. granted in part,* —— U.S. ——, 116 S.Ct. 805, 133 L.Ed.2d 752 (1996), *cert. dismissed,* —— U.S. ——, 116 S.Ct. 1037, 134 L.Ed.2d 113 (1996); *Smith v. World Ins. Co.,* 38 F.3d 1456, 1465 (8th Cir.1994) (in ADEA cases, the district court, in its discretion, may award front pay to make the injured party whole).

*Employment Opportunity Comm'n v. Delight Wholesale Co.,* 973 F.2d 664, 669–70 (8th Cir.1992)); *Equal Employment Opportunity Comm'n v. Delight Wholesale Co.,* 973 F.2d 664, 669–70 (8th Cir.1992) (citing *Franks v. Bowman Transp. Co., Inc.,* 424 U.S. 747, 763, 96 S.Ct. 1251, 1263–64, 47 L.Ed.2d 444 (1976); *King v. Staley,* 849 F.2d 1143, 1144 (8th Cir.1988)); *Wheeler v. Southland Corp.,* 875 F.2d 1246 (6th Cir.1989) (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975)) (purpose of Title VII is to make victims of unlawful employment discrimination whole). *Cf. Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1112 (8th Cir.) (noting, in the context of ADEA litigation, that "[b]ackpay awards in discrimination cases serve two functions: they make victimized employees whole for the injuries suffered as a result of the past discrimination, and they deter future discrimination.") (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421, 95 S.Ct. 2362, 2372–73, 45 L.Ed.2d 280 (1975) (Title VII case), *cert. denied,* 513 U.S. 946, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994); *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1097 (8th Cir.1982) (ADEA case)). Furthermore, once the district court finds unlawful discrimination in violation of Title VII, there is "a strong presumption that [the plaintiff is] entitled to a back-pay award on the basis of what [he or] she would have earned absent the discrimination, less any amount [he or] she could have earned in mitigation." *See Delight Wholesale Co.,* 973 F.2d at 670 (citing *King,* 849 F.2d at 1144; *DiSalvo v. Chamber of Commerce of Greater Kansas City,* 568 F.2d 593, 597 (8th Cir.

1978)); *Wheeler,* 875 F.2d at 1251 (absent exceptional circumstances, backpay should be awarded when a Title VII violation is found) (citing *Rasimas v. Michigan Dep't of Mental Health,* 714 F.2d 614, 626 (6th Cir.1983), *cert. denied,* 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984)).

In addition, regarding the length of the back-pay period, courts have found that an employee is not entitled to back-pay for a time period when he or she would not have been on the job in any event, for a reason unrelated to the illegal conduct of the employer.[26] *See Bhaya v. Westinghouse Elec. Corp.,* 709 F.Supp. 600, 604 (E.D.Pa. 1989) (where subsequent loss of pay was not caused by defendant's discrimination, back pay was limited accordingly), *aff'd,* 922 F.2d 184 (3d Cir.1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2827, 115 L.Ed.2d 997 (1991); *Meschino v. International Tel. & Tel. Corp.,* 661 F.Supp. 254, 257 (S.D.N.Y.1987) (prevailing plaintiff may not recover damages for the period after which he would have been terminated for a non-discriminatory reason; evidence indicated that plaintiff would have lost employment due to staff reductions and thus warranted limited back-pay); *Bonura v. Chase Manhattan Bank, N.A.,* 629 F.Supp. 353, 356 (S.D.N.Y.1986) (if the division in which plaintiff worked was entirely eliminated, he or she would not be entitled to benefits after that elimination); *Richardson v. Restaurant Marketing Assocs., Inc.,* 527 F.Supp. 690, 696 n. 1 (N.D.Cal.1981) ("Certainly, in the absence of persuasive evidence that plaintiffs would have been able to transfer to other RMA-managed facilities after its

---

**26.** Similarly, the Tenth Circuit has held that front-pay is "inappropriate if a defendant company has ceased doing business," contending that such an award would be inconsistent with the purpose of equitable remedies, which is to place the plaintiff into the position he or she would have been in absent the discriminatory conduct. *See Sandlin v. Corporate Interiors Inc.,* 972 F.2d 1212, 1215 (10th Cir.1992) (analyzing relief available under the ADEA, commenting that when defendant company has ceased to do business before judgment, plaintiff necessarily would have been discharged with the rest of the work force). Thus, any award of front pay should be limited by the estimated remaining tenure plaintiff would have enjoyed with his employer absent the discriminatory conduct. *See*

*id.* (citing *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1097 (8th Cir.1982)); *Graefenhain v. Pabst Brewing Co.,* 870 F.2d 1198, 1209 (7th Cir.1989) (where the employer satisfies its burden under the ADEA of demonstrating that the employee would have lost his job based on legitimate, nondiscriminatory criteria, the award of front pay after the termination date is not appropriate). *Cf. Hill v. Spiegel, Inc.,* 708 F.2d 233, 238 (6th Cir.1983) (limiting loss of earnings in general when work division is eliminated); *Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1097 (8th Cir.1982) ("aggrieved persons are not entitled to recover damages for the period beyond which they would have been terminated for a nondiscriminatory reason") (citations omitted).

San Francisco operation closed, and would have been willing to relocate for that purpose, this court will not award back pay for the period after RMA ceased to operate in San Francisco.") (citing *Helbling v. Unclaimed Salvage & Freight Co.*, 489 F.Supp. 956, 963 (E.D.Pa.1980)); *Helbling v. Unclaimed Salvage & Freight Co.*, 489 F.Supp. 956, 963 (E.D.Pa.1980) (closing of local branch at which plaintiff was employed as a manager terminated back-pay period); *see also Welch v. University of Texas & Its Marine Science Inst.*, 659 F.2d 531, 535 (5th Cir.1981) (back-pay period terminated at time when the grant which had funded plaintiff's position ended). However, if a plaintiff can show that the defendant employer would have retained the plaintiff even after the closing of the facility owned by the defendant at which the plaintiff worked, termination of back-pay on the date of the closing would not be appropriate. *See Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093, 1098 (8th Cir.1982).

In *Gibson v. Mohawk Rubber Co.*, 695 F.2d 1093 (8th Cir.1982), the jury found that the defendant unlawfully discharged the plaintiff because of his age and awarded him actual damages from the date of his discharge to the date of trial. *Gibson*, 695 F.2d at 1097. The defendant contended that the plaintiff's damages should have been cut off on the date of the closing of the plant at which the plaintiff worked, as opposed to the date of trial, because the plaintiff would have been terminated, irrespective of any allegedly discriminatory conduct by the defendant. *Id.* at 1097–98. In addition, the defendant argued there was not substantial evidence in the record from which the jury reasonably could find that the company would have retained the plaintiff after the plant at which he worked was closed. *Id.* The Eighth Circuit Court of Appeals found that the jury could have reasonably concluded that the defendant company would have retained the plaintiff after it closed one of its facilities. *Id.* at 1098. The court noted that among the evidence supporting this conclusion, plaintiff successfully performed his duties as general manager of the plant at which he worked and received numerous promotions and pay raises; at the time the defendant closed the plant at which the plaintiff worked, it still

operated numerous other facilities, and plaintiff had previously transferred to another plant to help manage the construction of the plant and train personnel; the general manager's position, along with various other managerial positions, still existed at that other plant; and the defendant had transferred at least one salaried employee and offered transfers to several others upon the closing of the plant at which plaintiff worked. *Id.* Based upon the evidence presented at trial, the court found that the district court did not err in refusing to limit the plaintiff's recovery as a matter of law to the period prior to the plant's closure. *Id.*

■■■ After June of 1993, defendant Easter Stores, a Partnership, sold all of its grocery stores. The Mason City store at which Mennen worked was sold to Nash Finch, and Easter had no agreement with Nash Finch as to whether the Easter store employees would retain their jobs as part of the sales transaction. These circumstances differ with those presented in *Gibson* in that after June of 1993, Easter Stores was no longer in the grocery business and had no control over whether its employees would be hired by Nash Finch and had no ability to transfer them to another facility. *Cf. Gibson*, 695 F.2d at 1098 (defendant employer only closed one facility, as opposed to closing their business altogether). The decision to hire Mennen was solely in the hands of Nash Finch; Easter had no control over Mennen's employment status with Nash Finch, once it relinquished control of the business through its sale. Easter Stores no longer paid salaries or provided benefits to any employee after June of 1993; thus, it is speculation that Mennen would have continued his position as grocery manager in the store and received the same salary and benefits, as the store was owned and operated by Nash Finch. Moreover, given Easter's concern about Mennen, namely his trustworthiness following the theft in the store, it is both likely that it would have relayed this concern to the management at Nash Finch and doubtful that Nash Finch would have hired Mennen upon hearing that information. Furthermore, although many of the Mason City employees were hired by Nash Finch,

within a year-and-a-half after the sale of the store, most of those employees had terminated their employment. Also, the evidence shows that Easter employees who were hired by Nash Finch experienced wage cuts and received different medical benefits than those offered by Easter Stores.

 A prevailing plaintiff may not recover damages for the period after which he would have been terminated for a non-discriminatory reason. *See, e.g., Bhaya,* 709 F.Supp. at 604; *Meschino,* 661 F.Supp. at 257. Upon the sale of the Mason City store on June 24, 1993, all employees of Easter Stores were terminated, and if Mennen had not been constructively discharged in April of 1992, he too would have been terminated and forced to seek other employment, whether it be at Nash Finch or elsewhere. Because Mennen would have been terminated on June 24, 1993, for a reason unrelated to the illegal conduct of Easter pursuant to the EPPA, *see Bhaya,* 709 F.Supp. at 604, *Meschino,* 661 F.Supp. at 257, and *Bonura,* 629 F.Supp. at 356, the court finds that Mennen has not carried his burden of proof to establish continued employment with Nash Finch. *Cf. Gibson,* 695 F.2d at 1100 n. 7 (noting that in ADEA cases, plaintiff bears the ultimate burden of persuasion on damages issues; thus, once defendant employer articulated a legitimate, nondiscriminatory reason, the closing of the plant at which plaintiff worked, why plaintiff is not entitled to recover damages

after the closing date, plaintiff would have the burden of proving that defendant would have transferred him to another position within its operations). The court therefore limits Mennen's award of lost past and future wages to a period dating from April 25, 1992, the day of Mennen's constructive discharge, until June 24, 1993, the date of the sale of the Mason City store to Nash Finch, less any amount of income earned at Sears and elsewhere.[27] Thus, the court awards Mennen lost wages in the amount of eighteen thousand two hundred twenty-five dollars and thirty-five cents ($18,225.35).

 Finally, the court must determine whether it should award prejudgment interest on Mennen's back-pay award. An award of prejudgment interest in an employment discrimination action is discretionary and involves at least two considerations: it compensates the plaintiff for money damages incurred and where liability and the amount of damages are fairly certain, it promotes settlement and deters the attempt to benefit unfairly from inherent delays in litigation. *Philipp v. ANR Freight Sys., Inc.,* 61 F.3d 669, 674–75 (8th Cir.1995) (denying prejudgment interest on back-pay award based upon defendant's "continued financial plight" and the fact that "liability was far from clear in the case") (citing *Equal Employment Opportunity Comm'n v. Rath Packing Co.,* 787 F.2d 318, 333 (8th Cir.), *cert. denied,* 479 U.S.

---

**27.** In its calculation of back-pay, the court first determined that Mennen lost income, vacation time, and health insurance benefits through June 24, 1993, which is the one hundred seventy-fifth day of the 365-day year. Converting that fact into a percentage, the court determined that Mennen had lost income, benefits, and vacation time for 47.9% of 1993. Having made that determination, the court then added (1) Mennen's lost income at Easter Stores in 1992 ($13,-326.00), less income from other sources ($2,983.35), resulting in net lost income of $10,-342.65 in 1992, and (2) Mennen's lost income at Easter Stores in 1993 through June 24, 1993 ($10,195.03), less income from Blazek Electric received before June 24, 1993 ($1,263.75), less income from Sears before June 24, 1993 ($2,317.45), resulting in net lost income of $6,613.83 in 1993. The total of Mennen's lost income for 1992 and 1993 was $16,956.48. The court did not deduct Mennen's unemployment compensation from his lost wages. *See Gaworski v. ITT Commercial Fin. Corp.,* 17 F.3d 1104, 1114

(8th Cir.) (adopting the majority rule among the circuits and holding that unemployment benefits should not be deducted from awards of backpay under the ADEA) (citations omitted), 513 U.S. 946, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994); *see also Equal Employment Opportunity Comm'n v. Kentucky State Police Dep't,* 80 F.3d 1086, 1100 (6th Cir.) (district court did not abuse its discretion in declining to deduct unemployment compensation), — U.S. —, 117 S.Ct. 385, 136 L.Ed.2d 302 (1996); *Craig v. Y & Y Snacks, Inc.,* 721 F.2d 77, 81–85 (3d Cir.1983) (holding that unemployment compensation should not be deducted from a Title VII back pay award).

Next, the court calculated Mennen's lost vacation value for 1993 through June 24, 1993, which equaled $195.91. The court then figured Mennen's health insurance benefits loss for 1993 through June 24, 1993, which equaled $1,072.96. Lastly, the court added the three figures, lost income, lost vacation value, and lost health insurance benefits, for a total of $18,225.35 in back-pay.

910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986)); *Equal Employment Opportunity Comm'n v. Rath Packing Co.*, 787 F.2d 318, 333 (8th Cir.) (district court properly weighed the interest of the victims in make-whole relief against the financial impact of the award against defendants) (citations omitted), *cert. denied*, 479 U.S. 910, 107 S.Ct. 307, 93 L.Ed.2d 282 (1986). *See also Malloy v. Monahan*, 73 F.3d 1012, 1019 (10th Cir.1996) (while prejudgment interest would serve a compensatory function, the equities of the case precluded such an award); *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 868 (3d Cir.1995) (prejudgment interest helps to make whole the victims of discrimination). The decision to award or deny prejudgment interest will be upheld unless the district court has abused its discretion. *Equal Employment Opportunity Comm'n v. Delight Wholesale Co.*, 973 F.2d 664, 670 (8th Cir. 1992).

 Here, in order to adequately compensate Mennen for the money damages he incurred, *see Philipp*, 61 F.3d at 674–75, *Rath Packing Co.*, 787 F.2d at 333, the court finds that an award of prejudgment interest is appropriate. Thus, the court awards Mennen prejudgment interest on his award of lost wages in the amount of four thousand ninety-eight dollars and twenty-two cents ($4,098.22).[28]

---

**28.** Regarding the rate at which prejudgment interest is calculated, the district court may grant prejudgment interest at a rate which it determines to be fair and equitable. *Rath Packing Co.*, 787 F.2d at 334 n. 14; *see O'Quinn v. New York Univ. Med. Ctr.*, 933 F.Supp. 341, 345 (S.D.N.Y.1996) (decision concerning what rate of prejudgment interest to apply, like the decision to grant interest, is one committed to sound discretion of district court). *See also Taxman v. Board of Educ. of Township of Piscataway*, 91 F.3d 1547, 1566 (3d Cir.1996) (district court did not abuse its discretion in calculating prejudgment interest using Internal Revenue Service adjusted prime rate, rather than using statute governing money judgment in a civil case recovered in the district court, 28 U.S.C. § 1961(a)), *petition for certiorari filed*, 65 U.S.L.W. 3354 (Oct. 31, 1996) (No. 96–679). While a district court may use the postjudgment standards of 28 U.S.C. § 1961(a), *see Sun Ship, Inc. v. Matson Navigation Co.*, 785 F.2d 59, 63 (3d Cir.1986), it is not compelled to do so. *Taxman*, 91 F.3d at 1566 (noting that the adjusted prime rate, established periodically by the Secretary of the Treasury and codified in 26 U.S.C. § 6621, has been regularly used by district courts to calculate prejudgment interest) (citing *Equal Employment Opportunity Comm'n v. Erie County*, 751 F.2d 79, 82 (2d Cir.1984)); *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 274 (7th Cir.1993) (no statute governs prejudgment interest in federal cases; court recommends using the prime rate); *Equal Employment Opportunity Comm'n v. O'Grady*, 857 F.2d 383, 391–92 (7th Cir.1988) (court upheld district court's calculation of prejudgment interest at the IRS adjusted prime rate); *Iannone v. Frederic R. Harris, Inc.*, 941 F.Supp. 403, 413 (S.D.N.Y.1996) (court awarded interest on the back pay award at the average annual United States Treasury bill rate, compounded annually); *Rush v. Scott Specialty Gases, Inc.*, 940 F.Supp. 814, 818 (E.D.Pa.1996) (prejudgment interest should be calculated on the IRS adjusted prime rate as provided in 26 U.S.C. § 6621, paid from the respective dates that the lost wages accrued and compounded quarterly) (citations omitted); *O'Quinn v. New York Univ. Med. Ctr.*, 933 F.Supp. 341, 345 (S.D.N.Y.1996) (use of the average annual U.S. Treasury bill rate under 28 U.S.C. § 1961 during period of back-pay is appropriate rate; interest shall be compounded annually); *Luciano v. Olsten Corp.*, 912 F.Supp. 663, 676–77 (E.D.N.Y. 1996) (use of the U.S. 52–week Treasury bill rate, referred to in 28 U.S.C. § 1961, is appropriate because it ensures that plaintiff is sufficiently, but not overly compensated); *Mulqueen v. Daka, Inc.*, 909 F.Supp. 86 (N.D.N.Y.1995) (prejudgment interest calculated with annual rates, based upon the federal short term rate pursuant to the Internal Revenue Code, 26 U.S.C. § 6621, guidelines for underpayment of taxes), *aff'd*, 104 F.3d 351, 1996 WL 545594 (2d Cir. Sept. 26, 1996); *Taylor v. Central Pa. Drug & Alcohol Servs. Corp.*, 890 F.Supp. 360, 368 (M.D.Pa.1995) (calculating prejudgment interest at the IRS guideline for overpayment of taxes); *Rao v. New York City Health & Hosps. Corp.*, 882 F.Supp. 321, 327–28 (S.D.N.Y.1995) (the Treasury bill rate is a reasonable rate to use for an award of prejudgment interest; to account for the considerable fluctuations in the Treasury bill rate, it is appropriate to calculate prejudgment interest according to the average rate over the period for which interest is to be awarded); *Young v. Lukens Steel Co.*, 881 F.Supp. 962, 978 (E.D.Pa.1994) (calculating prejudgment interest at the 52–week Treasury bill rate on the day of the judgment, compounded annually); *Davis v. Kansas City Hous. Auth.*, 822 F.Supp. 609, 617 (W.D.Mo.1993) (appropriate rate of interest used to calculate prejudgment interest is the statutory rate, provided in 28 U.S.C. § 1961, compounded annually).

Here, the court will calculate prejudgment interest at the current 52–week U.S. Treasury bill rate, which is 5.45 percent, and the interest shall be compounded annually. *See Young*, 881 F.Supp. at 978; *Davis*, 822 F.Supp. at 617. The interest on Mennen's lost income in 1992, calculated at a rate of 5.45 percent and compounded

## 2. *Damages for emotional distress*

 Mennen also contends he is entitled to an award of damages for the emotional distress he suffered as a result of taking the polygraph test and his demotion from the position of grocery manager based upon the results of his polygraph examination.[29]

annually, is $2,462.94. The interest on Mennen's lost income in 1993, calculated at a rate of 5.45 percent and compounded annually, is $1,635.28. The total amount of prejudgment interest awarded to Mennen on his back-pay award is $4,098.22. Thus, adding Mennen's back-pay award ($18,225.35) and the interest on that award ($4,098.22), the court finds that Mennen's award of back-pay, plus prejudgment interest, is twenty-two thousand three hundred twenty-three dollars and fifty-seven cents ($22,323.57).

**29.** Easter asserts that emotional distress damages are not available under the EPPA, contending that in Section 2005(c)(1) of the EPPA, the language, "legal or equitable relief as may be appropriate," does not include emotional distress damages. The court notes that section 2005(c)(1) provides that the employer shall be liable for whatever legal or equitable relief may be appropriate upon violating the EPPA. *See* 29 U.S.C. § 2005(c)(1). Furthermore, the statutory provision lists examples of appropriate legal relief, such as "employment, reinstatement, promotion, and the payment of lost wages and benefits." *See id.* Although the statute provides examples of relief that might be appropriate, Congress clearly indicated that this list was not exclusive to all other forms of relief, with its inclusion of the phrase "including, but not limited to" preceding the list of potential relief for violations of the EPPA. *See id.*

In determining whether emotional distress damages are available under the EPPA as a form of "legal or equitable relief as may be appropriate," the court turns to comparable language under section 16(b) of the Fair Labor Standards Act. This section provides for "legal or equitable relief as may be appropriate . . ., including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages." *See* 29 U.S.C. § 216(b). The Seventh Circuit Court of Appeals reached the conclusion that compensation for emotional distress damages is "appropriate" relief for intentional torts, such as retaliatory discharge, and found that these damages could be recovered under section 16(b) of the FLSA. *Travis v. Gary Community Mental Health Ctr., Inc.*, 921 F.2d 108, 111–12 (7th Cir. 1990), *cert. denied*, 502 U.S. 812, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991). *See also Soto v. Adams Elevator Equip. Co.*, 941 F.2d 543, 551–52 (7th Cir.1991) (finding that the district court erred in holding as a matter of law that punitive damages are not available under § 16(b) and reinstating punitive damages award on retaliation claim); *O'Brien v. Dekalb–Clinton Counties Ambulance Dist.*, No. 94–6121–CV–SJ–6, 1996 WL 565817, at *6 (W.D.Mo. June 24, 1996) (noting that the Seventh Circuit had been the only circuit to interpret the amended version of § 16(b) of the

FLSA and following Seventh Circuit's reasoning in *Travis* in finding that compensatory damages are available for violation of the FLSA's anti-retaliation provision). *But see Bolick v. Brevard County Sheriff's Dep't*, 937 F.Supp. 1560, 1566–67 (M.D.Fla.1996) (finding that emotional distress damages are not available under the FLSA; drawing comparison with the Fifth Circuit's interpretation of a similar damages provision for violations of the ADEA, citing *Dean v. American Sec. Ins. Co.*, 559 F.2d 1036, 1038–40 (5th Cir. 1977)).

In addition, the court observes that in *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court reiterated the traditional presumption that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin*, 503 U.S. at 70–71, 112 S.Ct. at 1035. In *Franklin*, the Court found that a damages remedy is available for an action brought pursuant to Title IX, noting that Congress, upon receiving the opportunity, made no effort to alter the traditional presumption in favor of any appropriate relief for violation of a federal right. *Id.* at 73, 112 S.Ct. at 1036–37. Thus, the Court commented that "[w]e cannot say, therefore, that Congress has limited the remedies available to a complainant in a suit brought under Title IX." *Id. See also Lebow v. American Trans Air, Inc.*, 86 F.3d 661, 670 (7th Cir.1996) (where text of the Railway Labor Act is silent concerning what remedies are available when an employee sues an employer for discharging him because of his union-organizing activities, punitive damages are available in an unlawful discharge action under the RLA; citing *Franklin* for the presumption that punitive damages are available under the RLA because Congress has not explicitly limited the remedies that a plaintiff may recover); *Reich v. Cambridgeport Air Sys., Inc.*, 26 F.3d 1187, 1191 (1st Cir.1994) (interpreting section 11(c) of the Occupational Safety and Health Act, which provides that the U.S. district courts shall "order all appropriate relief" for discrimination or discharge in violation of the subsection; adopting presumption in *Franklin* and finding that *Franklin* strongly suggests that 'all appropriate relief' as written in § 11(c) embraces monetary damages as well as other relevant forms of relief normally available, Congress having provided no "clear direction" to the contrary).

While damages for emotional distress are not expressly named in the statutory list of examples, the court finds that "appropriate" legal relief includes damages. *See Travis*, 921 F.2d at 111–12; *Reich*, 26 F.3d at 1191 ("The mere naming of certain included remedies neither suggests nor

Easter, on the other hand, asserts that any distress suffered by Mennen was a result of his own dissemination of information about his taking of the polygraph examination and the results of that examination. Mennen refutes Easter's assertion, claiming that the store employees already knew that he had taken the polygraph examination and failed to pass it, prior to any comments he made regarding the examination or the consequences of his failure to pass the examination. Furthermore, Mennen asserts that any of his comments regarding the situation were made in an attempt to mitigate the embarrassment and distress he felt, having been stripped of his duties and having been placed in the position he had originally occupied when he commenced work at the store while in high school.

Turning again to Title VII as a paradigm for principles for the computation of damages for emotional distress, courts have held that although Title VII plaintiffs can prove emotional injury by testimony without medical support, *see Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1215 (6th Cir.1996) (citing *Moody v. Pepsi–Cola Metro. Bottling Co.*, 915 F.2d 201, 210 (6th Cir.1990), and *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1273 (8th Cir.1981)), damages for mental and emotional distress will not be presumed and must be proven by "competent evidence." *Turic*, 85 F.3d at 1215 (citing *Carey v. Piphus*, 435 U.S. 247, 263–64 & n. 20, 98 S.Ct. 1042, 1052–53 & n. 20, 55 L.Ed.2d 252 (1978), and *Rodgers v. Fisher Body Div., General Motors Corp.*, 739 F.2d 1102 (6th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 821 (1985)). Courts have further acknowledged that while "essentially subjective, genuine injury … may be evidenced by one's conduct and observed by others." *Turic*, 85 F.3d at 1215 (quoting *Carey*, 435 U.S. at 264 n. 20, 98

S.Ct. at 1052 n. 20) (finding award of emotional distress damages not excessive where plaintiff was extremely upset and frightened after being discharged and also subsequently suffered nightmares, weight loss during her pregnancy, and excessive nervousness).

Mennen suffered humiliation and embarrassment because of the actions of Easter in using the results of the polygraph examination and in demoting him from his position as grocery manager. He began his employment with Easter's Mason City store on May 25, 1979, while he was in high school. Several promotions and thirteen years later, he served as the grocery manager for the store, handling supervisory duties over the cashiers of the store. Both Mennen and his sister testified at trial about the deep loyalty Mennen had toward Easter Stores and his intention to remain with Easter Stores for as long as it was in business. When Easter used the results of Mennen's polygraph examination and stripped him of the managerial duties he had worked steadily to earn over thirteen years of service, Mennen was devastated and humiliated. His humiliation stemmed, in part, from the fact that it was known throughout the store among the employees he used to supervise that Easter had stripped him of his duties and no longer trusted him to handle keys to or cash in the store. He no longer was a supervisor but was relegated to the position of stocker, the position he had occupied as a high school student in 1979. Candace Nicholson, a cashier who worked under Mennen's supervision, testified that managers and other employees had been gossiping about Mennen's failure to pass the polygraph examination and that one manager in particular had made jokes about Mennen's demotion. This humiliation resulting from Easter's violation of the EPPA led to depression for which he was treated by a counselor.[30] In addition, both Mennen's

is a 'clear direction' that other remedies are precluded," including compensatory and exemplary damages) (citing *Franklin*, 503 U.S. at 70–71, 112 S.Ct. at 1035–36). Based upon the interpretation of similar language by the Seventh Circuit Court of Appeals and upon the absence of contrary interpretation by other circuit courts of appeals, the court concludes that emotional distress damages are available to plaintiffs seeking relief for violations of the EPPA.

30. Mennen's counselor, Melford Robinson, testified that Mennen exhibited irritability, low mood, and generalized anxiety. In addition, Robinson stated that Mennen had sleep disturbances and experienced trouble maintaining his weight. Robinson indicated that all of these factors led him to his diagnosis of single-episode depression. Also, Robinson diagnosed Mennen as suffering from anxiety, observing that he experienced gen-

mother and sister testified that Mennen appeared depressed and withdrawn much of the time. Furthermore, the employees who worked for and with Mennen at the store testified that following the polygraph examination and the adverse employment action that followed, Mennen seemed quiet, sad, and withdrawn. While Mennen suffered other disappointments, such as a failed marriage, the evidence, as presented through Mennen and various other witnesses, clearly shows that Mennen suffered emotional distress as a result of Easter's use of Mennen's polygraph examination results and demotion because of the results in violation of the EPPA.[31] *Turic*, 85 F.3d at 1215 (quoting *Carey*, 435 U.S. at 264 n. 20, 98 S.Ct. at 1052 n. 20) (genuine injury may be evidenced by plaintiff's conduct and observed by others). Thus, the court finds that pursuant to section 2005(c)(1) of the EPPA, Mennen is entitled to recover fifteen thousand dollars ($15,000.00) in damages for emotional distress resulting from Easter's violation of sections 2002(2) and (3) of the EPPA.

### 3. Punitive damages

Lastly, Mennen asserts that he is entitled to an award of punitive damages under section 2005(c)(1) of the EPPA. Mennen, however, offers no argument in support of his assertion of entitlement to punitive damages, other than broadly asserting that Easter "acted in reckless disregard of the truth of its suspicions or with clear knowledge of the probable or likely consequence of its action." Mennen's Reply Brief, p. 15. Easter asserts that if punitive damages are available under section 2005(c)(1) of the EPPA, they should only be awarded upon a finding of actual or legal malice.

The Civil Rights Act of 1991 provides for awards of punitive damages where an employer is found to have "engaged in a discriminatory practice . . . with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *see also Turic*, 85 F.3d at 1216 (holding that although the actions of defendant's employees were "duplicitous and disclosed a lack of empathy, they did not rise to the level to support a punitive damages award under the Civil Rights Act of 1991."). *Cf. Karcher v. Emerson Elec. Co.*, 94 F.3d 502, 509 (8th Cir.1996) (holding that punitive damages claim should not have been submitted to the jury because there was insufficient evidence that defendant acted with malice or reckless indifference to plaintiff's federally protected rights as required under Title VII); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 830 n. 9 (4th Cir.1994) (a showing of more than intentional discrimination is required to recover punitive damages under the Civil Rights Act of 1991). While Easter clearly violated sections 2002(2) and (3) of the EPPA, the evidence does not show that Easter's actions were either willful or in reckless disregard of Mennen's rights. Neither Schlicher nor Dennis Easter testified that there was any animosity toward Mennen; on the contrary, despite the fact that Easter believed that Mennen had committed a theft within the store, it did not fire him and declined the opportunity to cut his wages and his hours, in recognition of the number of years he had dedicated to Easter Stores. Even assuming that an award of punitive damages is available under the EPPA, because the record is absent any evidence indicating a willful or reckless disregard for Mennen's rights, the court finds that an award of punitive damages is not warranted.[32]

---

eral frustration, anxiousness, and deficiencies in concentration.

**31.** The court further declines to adopt Easter's argument that Mennen caused his own emotional distress by disseminating information throughout the store pertaining to his results on the polygraph examination and Easter's actions following receipt of those results. It was already known throughout the store that Mennen had taken the polygraph test, that Easter had received the results, and that Mennen had been removed as grocery manager. Any comments

Mennen made regarding those circumstances or his plight in general were made after the news about the polygraph examination had spread throughout the store and for the purpose of mitigating some of the distress and embarrassment Mennen felt upon his removal as grocery manager.

**32.** As the prevailing party, Mennen is entitled to "reasonable costs, including attorney's fees." *See* 29 U.S.C. § 2005(c)(3) ("The court, in its discretion, may allow the prevailing party (other than the United States) reasonable costs, includ-

## IV. CONCLUSION

Following trial on the merits, and upon consideration of all evidence and arguments, the court finds that although Easter had the power to veto the administration of Mennen's polygraph examination, it did not require, request, suggest, or cause Mennen to take or submit to a polygraph examination in violation of section 2002(1) of the Employee Polygraph Protection Act. On the other hand, the court finds that Mennen has proved his claim that Easter used Mennen's polygraph examination results in violation of section 2002(2) of the EPPA. Furthermore, it was not until Easter learned that Mennen did not pass the polygraph examination that it decided to take adverse employment action. The results of Mennen's polygraph examination clearly provided the basis, or the motivating factor, for Easter's decision to remove Mennen as grocery manager of the store. Thus, the court concludes that Mennen has proved that Easter disciplined or discharged Mennen from his position as grocery manager of the store on the basis of his polygraph examination results in violation of section 2002(3) of the EPPA. Lastly, while it may not be free from all doubt, the court finds that, by its adverse employment action, Easter created work conditions that a reasonable person would find intolerable, and it was reasonably foreseeable that Mennen would resign because of his reassignment and removal from the position of grocery manager. Thus, the court concludes that Easter constructively discharged Mennen from his employment at the store.

Based upon Easter's violations of sections 2002(2) and (3) of the EPPA, the court finds that Mennen is entitled to an award of lost wages in the amount of $18,225.35, for a period of time from the date of his constructive discharge, April 25, 1992, through June 24, 1993, the date of the sale of the Mason City store to Nash Finch. The court also concludes that an award of prejudgment interest is appropriate, calculated at a rate of 5.45 percent, compounded annually. Thus, the court awards Mennen prejudgment interest on his award of lost wages in the amount of $4,098.22. In addition, the court concludes that Easter's violations of the EPPA caused Mennen emotional distress, entitling him to damages for this distress in the amount of $15,000.00. The court, however, determines that Mennen is not entitled to an award of punitive damages. Lastly, as a prevailing party, Mennen is entitled to reasonable attorney fees under section 2005(c)(3) of the EPPA.

Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

ing attorney's fees."). The court also notes that Rule 22(a) of the Local Rules for the United States District Court for the Northern District of Iowa requires all postjudgment motions for an award of attorney fees to be "filed within the time required by *Fed.R.Civ.P.* 54(d)(2)(B)." Federal Rule of Civil Procedure 54(d)(2)(B) provides that

> [u]nless otherwise provided by statute or order of the court, the motion must be filed and served no later than fourteen days after entry

of judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought.

*Fed.R.Civ.P.* 54(d)(2)(B). Thus, if Mennen seeks to recover attorney fees under 29 U.S.C. § 2005(c)(3), he must file a motion for attorney fees no later than fourteen days after the entry of judgment in this case.